IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

NO.: _____

| | | |
|---|---|---|
| WHITNEY NICOLE SHAFFER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| JAMES C. GAITHER, Jr., individually | ) | **[JURY TRIAL DEMANDED]** |
| and in his official capacity as District | ) | |
| Attorney of the 25th Prosecutorial District | ) | |
| of North Carolina, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Whitney Nicole Shaffer ("Plaintiff"), complaining of Defendant James C. Gaither, Jr. ("Defendant"), individually and in his official capacity as District Attorney of the 25th Prosecutorial District of North Carolina, alleges and says as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff is an adult citizen and a resident of Hendersonville, Henderson County, North Carolina.  At the time of the events alleged herein, Plaintiff was a resident of Cleveland County, North Carolina.

2.      Upon information and belief, Defendant is an adult citizen and a resident of Catawba County, North Carolina.  Defendant is the elected District Attorney ("DA") for the 25th Prosecutorial District of North Carolina.

3.      On or about October 25, 2013, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), EEOC Charge No.: 430-2014-00159, based on Defendant's violations of Title VII of the Civil Rights Act of 1964.

4.      As the 180-day time period to issue a decision was approaching and because the EEOC did not initiate or even commence an investigation, Plaintiff requested that the EEOC issue her a Right to Sue letter.  The EEOC forwarded Plaintiff's request to the U.S. Department of Justice ("DOJ") on or about April 25, 2014.  On or about June 11, 2014, Plaintiff received a Right to Sue letter from the DOJ.

5.      This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. §§ 1331 and 1367.

1

6.     This Court has personal jurisdiction over the parties and venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

7.     Plaintiff is an attorney licensed to practice law in North Carolina.  From February 1, 2013, through May 5, 2013, Plaintiff was employed as an Assistant District Attorney ("ADA") in the 25th Prosecutorial District of North Carolina, which encompasses Burke, Caldwell, and Catawba Counties.

8.     During Plaintiff's entire employment as an ADA, she reported directly to Defendant.

9.     Defendant controlled all aspects of Plaintiff's employment, including her employment terms, work location, work assignments, schedule, and tenure.

10.     Defendant assigned Plaintiff to serve as an ADA in the Catawba County District Court.  The primary office for the Catawba County District Court is located in Newton, North Carolina.

11.     Plaintiff primarily worked in a satellite office located within the district courthouse in Hickory, North Carolina ("Hickory Office").  The satellite office was usually staffed only by Plaintiff and an investigator, and Plaintiff was frequently in the office alone.

12.     At the time she started her employment, Plaintiff was told by her predecessor that Defendant would only come to the Hickory Office once every couple of months.  However, beginning almost immediately, Defendant appeared unannounced in the Hickory Office as often as once or twice a week.  Defendant usually arrived near the end of the day, when Plaintiff was alone in the office.

13.     During these unannounced visits, Defendant frequently appeared to be inebriated or otherwise impaired.  He engaged Plaintiff in conversations which were inappropriate, and which she found threatening and abusive.

14.     As an example, on one occasion Defendant talked to Plaintiff about his training as a wrestler in school.  He grabbed Plaintiff's wrist and explained how important "wrist control" was to overpowering an opponent.

15.     On another occasion, Defendant told Plaintiff that his favorite television program was *Vikings*, explaining that he enjoyed it because the Vikings were not afraid to kill for what they wanted.

16.     During the course of Plaintiff's employment, he also treated her differently from the male ADAs under his supervision, attempting to impose rules concerning her behavior.  For example, he instructed Plaintiff that she was not to be seen socializing in Catawba County, and

2

that she was not to have lunch with anyone other than him. He also instructed her not to tell anyone outside of the court system that she was an attorney.

17.     Throughout Plaintiff's employment, Defendant expressly stated to Plaintiff that he was a very powerful man and was not afraid to use his power in favor of those who supported him and against those that crossed him or would not support him.

18.     As an example and as a way to prove to Plaintiff how powerful he was, very shortly after Plaintiff began her employment as an ADA, Defendant directed her to "enter dismissals" on contested cases for which Plaintiff was not the acting ADA. Upon information and belief, as Defendant did in the past, he was attempting to use his position as DA to obtain favorable and preferential judicial outcomes for his friends and political allies. Plaintiff refused to comply with Defendant's improper and unethical requests.

19.     Defendant worked primarily from the Newton office and, as a result, would not regularly see Plaintiff before court sessions. Defendant asked Plaintiff to give him her personal cell phone number so that he could easily reach her. Plaintiff complied with Defendant's request and gave him her cell phone number. At the time, Plaintiff thought that Defendant wanted her cell phone number so that he could contact her for work-related issues if he was not able to contact her in the office.

20.     Beginning in or around April 2013, Defendant began sending Plaintiff text messages to her cell phone which were very clearly not related to work.

21.     On several occasions, Defendant would demand to see Plaintiff's cell phone and review her text messages. He instructed her to delete text messages from her phone. Plaintiff understood Defendant to be instructing her specifically to delete text messages from him. Fearful of angering him or losing her job, Plaintiff complied with his instructions.

22.     On or about the afternoon of Thursday, April 25, 2013, Defendant made another unannounced visit to the Hickory Office. He then insisted that Plaintiff leave the office and go to dinner with him, so that he could speak with her without being overheard by anyone else. Plaintiff reluctantly agreed because she believed her job would be in jeopardy if she did not attend.

23.     Defendant insisted that Plaintiff ride with him from the office to dinner. Plaintiff told Defendant she would drive her car to the dinner location and meet him there, as Plaintiff did not feel comfortable riding with Defendant. Defendant again forcefully insisted that she drive with him. Plaintiff reluctantly agreed to ride with him after he promised to bring her back to the office immediately after dinner.

24.     Although Defendant told Plaintiff that the purpose of the dinner was to discuss business, it quickly became apparent that he had different intentions. He drank heavily during the meal, and made several inappropriate sexual comments to her, demanding that she tell him about her sexual history. Defendant's conduct made Plaintiff feel very uncomfortable.

3

25.     Defendant asked Plaintiff if "this would be a bad time to hit on [her]."  Plaintiff responded that she understood his intentions, but that she was not willing to have a non-business relationship with him.  Plaintiff attempted to make light of the situation, as Defendant was her boss and she recognized the power he had over her.

26.     Following dinner, Plaintiff requested that Defendant drive her back to the office, as promised.  Defendant and Plaintiff left the dinner in Defendant's car.  While Defendant was driving, he put his right hand on Plaintiff's left thigh and began to move his hand up her inner thigh.  Plaintiff grabbed Defendant's hand and stopped him.  She again told Defendant that she did not want that kind of relationship.  Defendant's unwanted touching made Plaintiff feel violated and uncomfortable.

27.     Instead of driving Plaintiff back to the office, Defendant drove to a convenience store where he purchased a single beer, and returned to the car.  Defendant then opened the beer and, while drinking it, drove Plaintiff to his lake home against her will.

28.     During the drive, Plaintiff asked Defendant where he was going and repeatedly told him that he needed to take her back to the office.  After reaching Defendant's lake house, Defendant tried to persuade Plaintiff to go into the house with him.  He attempted to kiss her, and to force her to touch him.  Plaintiff understood that Defendant wanted her to go inside to have a physical relationship with him.

29.     Plaintiff refused to go into Defendant's house and again demanded that Defendant take her back to the office.  Finally, Defendant reluctantly complied.  He demanded to know whether she would tell anyone about the incident, and Plaintiff assured him that she would not, and that she would remain professional.

30.     The following day, Defendant made another unannounced visit to the Hickory Office and insisted that Plaintiff go for a run with him.  Eager to ensure that their conversation was in a public place, Plaintiff agreed.  During the run, Defendant told Plaintiff that it upset him to have to chase her.  He further told her that she was "giving up a good opportunity" by refusing to have sex with him.  His comments made Plaintiff extremely uncomfortable.

31.     Defendant continued his unwanted sexual advances over the weekend, this time via text message.  For example, Defendant sent Plaintiff a text message at 11:17 a.m. on Saturday, April 27, stating: "I enjoy it when I can communicate through suggestion and can rely on the other party's generous interpretation of meaning when faced with two or more options. Innuendo couched terminology symbolism double entendre are the stuff you have to have to be real…"[1]

32.     Two minutes later, Defendant sent Plaintiff a text message stating: "While I correctly told you that Es tu ma Bon fille is a proposition in Paris I only use it as a pretty phrase

---

[1] True and accurate copies of all text messages cited herein (with telephone numbers and case-related information redacted) are attached hereto as <u>Exhibit A</u> and incorporated herein by reference.

4

.… Et tut Mir leid."  Plaintiff understood the phrase "Es tu ma bon fille" to mean "Are you my good girl[?]" and to be yet another sexual proposition from Defendant.

33.     Plaintiff did not respond to those text messages from Defendant.

34.     The next day, on April 28, 2013, at 1:56 p.m., Defendant texted Plaintiff the following: "If you feel like decompressing I can get us a fire going this afternoon…Just let me know.  Monday is always such a mess[.]"

35.     Approximately two hours later, at 3:48 p.m. on April 28, 2013, Defendant simply texted "Hello," followed by: "Wrapping up at ymca you have the time n inclination?"  Plaintiff understood Defendant's message to be another sexual proposition from Defendant.

36.     Plaintiff believed that Defendant would not stop harassing her and that Defendant would retaliate against her if she did not respond.  Fearful for both her job and, in light of his habit of making unannounced visits to the Hickory Office and his statements about "wrist control" and violence, her safety, she decided to respond to his text messages.

37.     She finally sent a response text message at 4:05 p.m. stating: "Leaving chapel hill now. Given the weather and that hickory isn't (*sic*) really on my way I'm just going on to [S]helby."

38.     In reality, Plaintiff was not in Chapel Hill that day, but responded as such in an attempt to avoid any non-business interaction with Defendant without triggering any retaliation.

39.     Defendant responded at 4:28 p.m.: "Well that makes good sense…. Not something I am used to or particularly fond of."  One minute later, Defendant wrote: "Let me know if you want company on the drive n I will call you…  Otherwise…"  Approximately one hour later at 5:28 p.m., Defendant texted simply: "Call me."

40.     Defendant persistently continued to contact Plaintiff, and between 6:02 p.m. and 6:20 p.m. on April 28, 2013, texted: "Hey Nikki I have called and texted a couple of times need to speak with you," "Please call," and "Wtf [what the fuck]."

41.     In an attempt to placate Defendant, Plaintiff responded at 6:21 p.m. on April 28, 2013, and stated: "Hold on I have to get to a place I can talk."  Defendant immediately responded "Call me ASAP."

42.     Plaintiff then called Defendant, at which point he advised her that he had inadvertently sent a text intended for her to another ADA, Clifton Smith.  At 6:40 p.m., he forwarded the text to her.  It read: "Nikki I definitely do not mind being ignored but in the context of the immediate past I would certainly like to have a brief explanation…thx."

43.     Plaintiff understood Defendant's reference to the "immediate past" to refer to the April 25, 2013, incident.  However, in an effort to avoid becoming the subject of office gossip, and to avoid triggering any retaliation by Defendant in light of his stated desire to keep his

5

inappropriate actions secret, she suggested that Defendant tell Mr. Smith that the text was related to work problems she had experienced with another attorney.

44.     Defendant agreed to this suggestion, but then texted at 6:46 p.m. that there was still "one thing to be dealt with[,]" adding: "I am being aggressive and that un nerves me," "I need some direction here," and "Out of my comfort zone."

45.     By this point in time, Plaintiff was in serious fear for both her job and her physical safety.  However, in order to placate Defendant, she responded with an attempt to stall his advances in the hopes that she could avoid any further escalation of the issue.  At 6:49 p.m., she texted him: "Be aggressive that's fine – but given the circumstances I think we should be somewhat slower than I would normally be."

46.     Defendant responded at 6:51 p.m. on April 28, 2013, and texted: "I think opposite…."  Stunningly, he reminded Plaintiff of his assault on her after the April 25, 2013, dinner:  "I've laid hands on you and love the feel of your body… I'm distracted at this point….," "What I would appreciate is some aggression from ur end," and "Ha works every time… Seriously… Bring it."

47.     Again trying to be tactful with her employer and hoping again to put off his advances, Plaintiff texted: "OK I can do that – remember I want to be semi circumspect but now I have feedback so I know what you like."  Defendant responded with "Yes you do…" and "And I'd say circumspect… Not semi…. We can talk tomorrow… And I can use feedback as well."

48.     Later that evening at 7:59 p.m., Plaintiff again tried to avoid further interaction with Defendant by telling him that she might not be available to speak the next day. Defendant responded by throwing her words back in her face, quoting her text from 6:49 p.m. and then texting: "Nikki not sure if ur a study in contrasts or what…no sex since August?"

49.     The following work week was close to unbearable for Plaintiff.  In addition to working at the Hickory Office and expecting that Defendant would drop in at any moment, she was subjected to a barrage of harassing text messages from him.  He remarked on her body and clothing, texting "Miss the dress" after seeing that she was wearing pants, and asking "Do you ever wear loose fitting dresses? Or skirts[.]"

50.     Defendant also tried to convince Plaintiff to go for runs with him, to meet him at the gym, and to have dinner with him.  She dodged him repeatedly, claiming that she did not have time to meet with him.  Again, Plaintiff sought to avoid escalating her interactions with Defendant.

51.     Plaintiff found those messages, and Defendant's conduct, to be highly inappropriate and offensive.  Plaintiff also believed that Defendant was becoming more and more aggressive and forward with his unwanted sexual advances.  Plaintiff was concerned for her job because Defendant made it clear to her that it would be problematic for her employment if she refused his advances.  She was also concerned for her physical safety, and in particular was

afraid that he would simply appear unannounced at her home, as he had done at the Hickory Office.

52.     On April 30, 2013, Defendant invited Plaintiff to attend a conference in Charlotte with him that weekend, explaining that he had reserved a condominium and that spending a weekend with him would help her "out of [her] shell."  Plaintiff declined the invitation.

53.     On the morning of Wednesday, May 1, 2013, Defendant sent Plaintiff several pictures of his lake house, again attempting to convince her to accompany him there.  Later that day, the following text conversation occurred between 11:08 a.m. and 12:47 p.m.:

> Defendant:  "I have decided that grunting is a superior form of communication to texting"
>
> Plaintiff:  "I'm grunting.  I feel disgusting and nauseated and court is a circus"
>
> Defendant:  "Well you seem not to realize that I have a cure for that.  Except the court part…"
>
> Plaintiff:  "No I think my allergies finally hit full force"
>
> Defendant:  "??? Pls avoid the allusions"
>
> Defendant:  "Allergy to ???"
>
> Plaintiff:  "Allergies to pollen.  That's why I'm ill."
>
> Defendant:  "Grunting def better…. Thought you were referencing me… Lets do lunch, bitch"
>
> Plaintiff:  "Don't call me bitch.  I am not in the mood for lunch"
>
> Defendant:   "I am obviously having some issues w calculating you … My apologies Nikki I have made numerous overtures too many in fact"
>
> Defendant:  "I will see you at the Y at 12 45 ish"
>
> Defendant:  "I think that I am beginning to understand that arrogant ass reference however it does not particularly bother me and still lunch I must insist…S'il vo
>
> Defendant: us plait"
>
> Plaintiff:  "Still in court"
>
> Defendant:   "I understand I am on the track behind the Y as nicely as I can ask you please meet me here when court breaks"

Plaintiff: "You offended me and your constant texting during court distracts me from my job. I will not be at the y and I suggest you avoid me today I'm in a foul mood"

Defendant: "This is personal and I would rather speak now so I will respect whatever you wish But ask that you would do likewise I would not say I am in a foul mood

Defendant: but I am in a mood and would desire 15 minutes of your time to resolve… And if no offense is intended no offense should be taken"

Defendant: "No I lied I am in a foul mood… Maybe the run will help see you later"

54.     Later that day at 2:33 p.m., Defendant sent Plaintiff text messages in which he even acknowledged that he caused her confusion, anxiety, and fear: "I am truly sorry for my part in whatever it is you re feeling… Confusion anxiety fear etc…. I can only imagine. You put on a good exterior but reason should have forestalled me and it was my error to push. When in doubt I tend to engage. Please come to me as someone that u can trust and I will do my utmost to deserve such. JG."

55.     On Friday, May 3, 2013, Defendant texted Plaintiff in the morning and asked her to call him on her drive into the office. Plaintiff did not call, but instead asked Defendant what he needed, stating that she had an emergency and was absent from work. He texted Plaintiff that he was "a long tailed cat in a roomful of rocking chairs." He then went on to expound his concerns with the following messages: "Worried about the extent of the offense I've given you and my inability to ameliorate it," "That is in the form of a question," "Would appreciate ur call unless emergency is serious in which case pls give me a call re anything you may need," "Have not heard more re emergency is all ok?"

56.     Plaintiff tried to avoid the situation by responding at 6:59 p.m. on May 3, 2013: "I'm OK will talk later."

57.     Finally, Defendant texted Plaintiff the following: "Nikki I am concerned that' my conduct is going to come back and hurt my family. Can you pls reply and let me know."

58.     Defendant is married and has four children.

59.     Eventually, Plaintiff's work environment because so intolerable due to constant sexual harassment from Defendant, fear of violence, and what Plaintiff perceived to be wholly inappropriate conduct prejudicial to the administration of justice by Defendant.

60.     On May 5, 2013, Plaintiff resigned from her position as an ADA. She texted Defendant to advise him of her resignation, stating: "My letter of resignation is on my former desk in hickory. I regret I cannot work a notice. I do not intend to make a public issue of my

8

concerns so any concerns about the election or your family should not be an issue. It would be better to avoid contacting me again. You can tell others I am pursuing an alternative job opportunity." Defendant responded: "Understood."

61.     After Plaintiff resigned from her employment, Defendant began spreading false rumors that he had terminated her employment for misconduct.

62.     Upon information and belief, Defendant told at least David Moose and Scott Riley – both attorneys in the local bar where Plaintiff practiced – that he had fired Plaintiff for misconduct. Upon information and belief, he made similar statements to Judge Gregory R. Hayes.

63.     Defendant's statements were false and Defendant knew they were false at the time he made the statements.

64.     Defendant's false statements were in retaliation for Plaintiff's rejection of his advances and her decision to resign her employment.

65.     During Plaintiff's entire employment with Defendant in the 25th Prosecutorial District, there was no Director of Human Resources, no training on human resource policies, no training on sexual harassment, and no method for reporting acts of sexual harassment or the investigation of such conduct.

66.     There was also no one to whom Plaintiff could report Defendant's sexual harassment because he is the DA and the highest office holder in the 25th Judicial District District Attorney's Office.

## <u>FIRST CAUSE OF ACTION</u>
**[Sexual Harassment/Hostile Work Environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* – Defendant in his Individual and Official Capacity]**

67.     Plaintiff restates and realleges the allegations above as if fully set forth herein.

68.     Defendant engaged in intimidation, ridicule, and insult which was directed at Plaintiff.

69.     Defendant's harassment of Plaintiff was unwelcome.

70.     Defendant's harassment of Plaintiff was based upon her sex.

71.     Defendant's harassment of Plaintiff was so severe and pervasive that it altered the conditions of her employment and created an objectively hostile work environment.

72.     Plaintiff subjectively viewed Defendant's harassment of her as abusive.

9

73.     At all times relevant to the events alleged herein, Defendant was Plaintiff's employer.

74.     Defendant did not exercise reasonable care to prevent or correct any sexually harassing behavior.

75.     Upon information and belief, Defendant's actions were also taken with malice and/or with reckless indifference to Plaintiff's federally protected rights.

76.     As a direct and proximate result of Defendant's violations of Title VII of the Civil Rights Act of 1964, Plaintiff has been damaged in an amount to be determined at trial, including but not limited to compensatory and punitive damages.

## SECOND CAUSE OF ACTION
**[Sexual Harassment/Quid Pro Quo in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* – Defendant in his Individual and Official Capacity]**

77.     Plaintiff restates and realleges the allegations above as if fully set forth herein.

78.     Plaintiff is female and belongs to a protected class under Title VII.

79.     Plaintiff was subjected to unwelcome sexual harassment by Defendant.

80.     Defendant's harassment of Plaintiff was based upon her sex.

81.     Plaintiff's rejection of Defendant's unwelcome sexual advances affected tangible aspects of the terms, conditions, and privileges of her employment.

82.     At all times relevant to the events alleged herein, Defendant was Plaintiff's employer.

83.     Defendant did not exercise reasonable care to prevent or correct any sexually harassing behavior.

84.     Upon information and belief, Defendant's actions were also taken with malice and/or with reckless indifference to Plaintiff's federally protected rights.

85.     As a direct and proximate result of Defendant's violations of Title VII of the Civil Rights Act of 1964, Plaintiff has been damaged in an amount to be determined at trial, including but not limited to compensatory and punitive damages.

## THIRD CAUSE OF ACTION
**[Constructive Discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* – Defendant in his Individual and Official Capacity]**

86.     Plaintiff restates and realleges the allegations above as if fully set forth herein.

10

87.     Defendant's harassment of Plaintiff was deliberate, and was motivated by a bias based upon Plaintiff's sex.

88.     As a result of Defendant's actions, Plaintiff's working conditions were objectively intolerable.

89.     Defendant did not exercise reasonable care to prevent or correct any sexually harassing behavior.

90.     As a direct and proximate result of Defendant's violations of Title VII of the Civil Rights Act of 1964, Plaintiff has been damaged in an amount to be determined at trial, including but not limited to backpay and/or frontpay, as well as compensatory and punitive damages.

## FOURTH CAUSE OF ACTION
### [42 U.S.C. § 1983 – Defendant in his Individual Capacity]

91.     Plaintiff restates and realleges the allegations above as if fully set forth herein.

92.     As described above, Defendant, a state official, has violated Plaintiff's rights and privileged under the Constitution of the United States.  Specifically, but not exclusively, Defendant's intentional sexual harassment of Plaintiff, who is a public employee and his subordinate, constitutes gender discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

93.     At the time of Defendant's violations of Plaintiff's constitutional rights, he was a person acting under color of state law.

94.     As a direct and proximate result of Defendant's violations of Plaintiff's constitutional rights, Plaintiff has been damaged in an amount to be determined at trial, including but not limited to compensatory and punitive damages.

## FIFTH CAUSE OF ACTION
### [Defamation *per se* – Defendant in his Individual Capacity]

95.     Plaintiff restates and realleges the allegations above as if fully set forth herein.

96.     As described above, Defendant published numerous false statements to third parties which tend to impugn Plaintiff in her trade, business, and profession, and otherwise have a harmful effect on Plaintiff, including that Defendant terminated Plaintiff's employment for misconduct.

97.     Defendant's statements were false at the time Defendant made them, and Defendant knew his statements were false.

11

98.     Defendant's statements, set forth above, are capable of only one reasonable interpretation – a defamatory one.

99.     Defendant's statements constitute defamation *per se* because they plainly and openly disparage Plaintiff's profession and business, accuse Plaintiff of sexual misconduct, unethical, and possibly illegal behavior, and otherwise tend to subject Plaintiff to ridicule, contempt, or disgrace.

100.    As a result of Defendant's defamation *per se*, Plaintiff has suffered damages in an amount to be determined at trial.

101.    Defendant's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Plaintiff's rights.  As such, pursuant to N.C. Gen. Stat. § 1D-1, *et seq.*,  Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial, sufficient to punish Defendant for his wrongful conduct and to deter such conduct in the future by Defendant and others similarly situated.

## SIXTH (ALTERNATIVE) CAUSE OF ACTION
### [Defamation – Defendant in his Individual Capacity]

102.    Plaintiff restates and realleges the allegations above as if fully set forth herein.

103.    As set forth above, Defendant published false and defamatory statements about Plaintiff that impeached her reputation, trade, and business, including that Defendant terminated Plaintiff's employment for misconduct.

104.    Those defamatory statements were communicated and published to persons other than Defendant.

105.    Defendant published the defamatory statements to others with malice and knowledge of, or reckless disregard for, their falsity.

106.    The published statements caused injury to Plaintiff by impeaching Plaintiff's business and falsely accusing Plaintiff of engaging in unethical and potentially illegal behavior.

107.    If Defendant's statements were not defamatory *per se*, the statements were false and defamatory in light of the circumstances under which they were made.

108.    As a direct and proximate result of Defendant's defamatory statements, Plaintiff has suffered damages in an amount to be determined at trial.

109.    Defendant's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Plaintiff's rights.  As such, pursuant to N.C. Gen. Stat. § 1D-1, *et seq.*,  Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial, sufficient to punish Defendant for his wrongful conduct and to deter such conduct in the future by Defendant and others similarly situated.

12

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant the following relief:

1.      An award for Plaintiff against Defendant in his official capacity as District Attorney of the 25th Prosecutorial District of North Carolina based on Defendant's Sexual Harassment/Hostile Work Environment, Sexual Harassment/Quid Pro Quo, and Constructive Discharge in violation of Title VII of the Civil Rights Act of 1964;

2.      An award for Plaintiff against Defendant in his individual capacity based on Defendant's Sexual Harassment/Hostile Work Environment, Sexual Harassment/Quid Pro Quo, and Constructive Discharge in violation of Title VII of the Civil Rights Act of 1964, violations of Plaintiff's constitutional rights, defamation *per se*, and defamation;

3.      An award for Plaintiff against Defendant in his individual and official capacities for punitive damages pursuant to the Civil Rights Act of 1964, N.C. Gen. Stat. § 1D-1, *et seq.*, and all other applicable law;

4.      An award for Plaintiff for her reasonable attorneys' fees pursuant to the Civil Rights Act of 1964 and all other applicable law;

5.      That the Court tax the costs of this action against Defendant;

6.      That Plaintiff have and recover interest on all damages as allowed by law; and

7.      For all other relief, both legal and equitable, which the Court deems just and proper.

**Plaintiff requests a trial by jury on all matters so triable.**

Respectfully submitted this the 26th day of June, 2014.

**JAMES, McELROY & DIEHL, P.A.**

    s/ John R. Buric
_____
John R. Buric, N.C. State Bar No. 22688
jburic@jmdlaw.com
Kristen E. Finlon, N.C. State Bar No. 39252
kfinlon@jmdlaw.com
John R. Brickley, N.C. State Bar No. 41126
jbrickley@jmdlaw.com
600 South College Street
Charlotte, North Carolina 28202
Telephone: (704) 372-9870
Facsimile: (704) 333-5508
*Attorneys for Plaintiff*

13